**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:10-cr-021-SAO |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| | ) | |
| vs. | ) | **(Trial by Court)** |
| | ) | |
| JAMES ALBERT WILDE, | ) | |
| | ) | |
| Defendant. | ) | |

_____

This case was tried before the court on a four count information charging James Albert Wilde with Interfering with an Agency Function in violation of 36 C.F.R. §2.32(a)(1), Violating a Lawful Order in violation of 36 C.F.R. §2.32(a)(2), Disorderly Conduct in violation of 36 C.F.R. §2.34(a)(1), and Operating an Unregistered Boat, in violation of 36 C.F.R. §3.2(b), AS 05.25.055(a) & (d) & AS 05.25.090(b)(2). These offenses were alleged to occur on or about September 16, 2010 within the Yukon-Charley Rivers National Preserve.[1] Upon due consideration of the evidence and arguments of the parties, the court finds

_____

[1] Prior to trial, Mr. Wilde filed a Motion to Dismiss All Counts due to unauthorized and unlawful stop that preceded an unauthorized and unlawful arrest, at Docket No. 14. The government filed an Opposition at Docket No. 20. The State of Alaska was permitted and filed an *amicus curiae* brief at Docket No. 21. The State of Alaska filed a Reply of Amicus at Docket 41 and the defendant filed a Reply at Docket 42. Upon due consideration of the arguments and undisputed facts, the court denied the Defendant's motion in a written opinion at Docket 52.

that the government has met its burden of proof as to Counts 1, 2, and 4, but not as to Count 3.

A trial was conducted. The following government witnesses provided testimony: National Park Service (NPS) Ranger Andrew Joseph Dallemolle, NPS Ranger Benjamin Grodjesk, NPS Ranger Scott Sample, Ms. Louis Flynn, and Mr. Joel Cusick. The following defense witnesses provided testimony: Mrs. Hannelore Wilde, Mr. Fredrick Schenk, NPS Ranger Scott Sample, Mr. Craig Compeau and Mr. James Wilde. The court considered government exhibits 1-18, 20-25, 27, and 30-34. The court considered defense exhibits B, C, H, and I. The court received written closing arguments from government and defense. Both sides provided responses to the opposing arguments.

## FINDINGS OF FACT

On September 16, 2010, James Albert Wilde, his wife Hannelore Wilde, and mutual friend Fredrick Schenk took Mr. Wilde's 21 foot Woolridge riverboat on the Yukon River for a hunting trip. The vessel was heavily loaded with supplies, including provisions and weapons. Mrs. Hannelore Wilde and Mr. Fred Shenk were passengers, while Mr. Wilde piloted the boat. The group was headed to Slaven's Cabin at Coal Creek, where they planned to rest for the evening. National Park Service Rangers Andrew Joseph Dallemolle (hereafter Dallemolle), a seasonal U.S.

Park Ranger in his first season on the Yukon Charley River, and Benjamin Brach Grodjesk (hereafter Grodjesk) worked on the Yukon Charley River. On September 16, 2010, wearing park ranger uniforms, Dallemolle and Grodjesk started out from Slaven's cabin in their boat at approximately 1:30 pm in the afternoon. Grodjesk operated his boat on that area of the Yukon River for the previous two and a half to three months prior to September 16, 2010 and in the previous year, operating a boat patrol. The purpose of their trip was to check boats to make sure they were in compliance with applicable regulations; including boating safety, hunting and fishing regulations. Grodjesk was piloting the Rangers' boat.

The Rangers contacted one vessel, conducted their check, and then continued down the river. They saw another boat coming towards them from down river (headed up river) at approximately 3:00pm which was later determined as Mr. Wilde's boat. While still several hundred yards away, in the main channel, the Rangers brought their boat to an idle and let their boat drift in the river until Mr. Wilde's boat got closer. When the boats were between 200 and 300 yards apart, Dallemolle went on the bow of his vessel, put out the boat's bumpers, and signaled to Mr. Wilde's boat with his hands for Mr. Wilde's boat to come toward the Ranger's boat. Mr. Wilde did as instructed and brought his boat toward the Ranger's boat until it was within approximately

50 yards. The Ranger then signaled to Mr. Wilde to slow down by waving his arm downward. Mr. Wilde's boat 'powered down' and slowly approached the Rangers' boat, coming to within 20 to 30 feet from the Rangers' boat. Mr. Wilde's boat was idling at this time.

Dallemolle yelled to the only person he could clearly see, a passenger (later identified as Mr. Fred Schenk) on the back of Mr. Wilde's boat. Dallemolle yelled to Mr. Shenk "tell the driver to come to an idle… National Park Service, we're going to do a vehicle inspection." Mr. Shenk did not say anything in response, but just took pictures of the Rangers' boat.[2] However, a man, later identified as Mr. Wilde, then opened a front window hatch from the cabin on the bow of his boat and stepped partially onto the bow of his boat. Mr. Wilde's boat coasted under its own momentum, with its engine idling, towards the Rangers' vessel until it was within approximately 20 feet away, with the Ranger's boat being pointed straight at Mr. Wilde's boat which was approaching.[3] Dallemolle noticed that Mr. Wilde's boat did not have proper registration decals on the boat. Mr.

_____

[2] Evidence admitted at trial showed that Mr. Schenk began taking pictures when the boats were still further apart, at approximately 50 yards.

[3] Though Mr. Wilde's engine was idling, testimony indicated it was "not very loud at the time."

Wilde said "What the hell do you want?" or words to that effect.[4]
Dallemolle responded "National Park Service, we're going to do a
quick vehicle inspection. Shut off your engine and we'll come
to you."[5] Mr. Wilde yelled back "Like hell", stepped back into
his cabin, slammed his door shut and immediately walked to the
stern of his boat, where he was fully visible to Dallemolle.
Mr. Wilde then yelled to Dallemolle "You fucking cock suckers.
I'm not stopping." Mr. Wilde also said that he was loaded down
and that he would not get back up on step. Dallemolle responded
"We'll have you on your way in a few minutes." Mr. Wilde
abruptly responded by yelling "Fuck this." Mr. Wilde then went
back to his cabin, sat down at the helm, powered up the vehicle
and began moving his boat forward. Mr. Shenk lost his footing
and nearly fell out of the boat because of the momentum of

---

[4] Mrs. Hannelore Wilde testified that Mr. Wilde asked 'What's
going on ?", not "What the hell do you want ?". I did not find
her testimony credible on this point. On cross examination, her
testimony grew to add supporting details uncorroborated by any
other witness for the defense. In contrast to her earlier
testimony, her testimony on this point was hesitant and she
averted her eyes. Her testimony was internally inconsistent
because she testified that Mr. Wilde used graphic profanities
when talking to the officers, but when testifying as to his
"exact" language on questioning by Mr. Wilde's counsel, she
omitted those profanities or, if uncomfortable making them
herself, failed to indicate when they were made by Mr. Wilde.

[5] Mrs. Hannelore Wilde testified the Ranger asked to check Mr.
Wilde's saltwater license in addition to doing the safety check,
however, no other witnesses recalled this request.

starting the boat, however Mr. Shenk was able to brace himself and did not fall out of the boat.

Mr. Wilde's boat moved faster and within ten seconds was back on step, continuing moving up river. The Rangers put power to their engine to pursue Mr. Wilde's boat. The Rangers' boat turned behind Mr. Wilde's boat to draw a parallel course on the starboard side. Within approximately ten seconds the Ranger's boat was on step and within twenty seconds the Rangers caught up to Mr. Wilde's boat. The Ranger's boat was approximately ten to twenty feet off the starboard side of Mr. Wilde's boat traveling in a parallel course, heading up river. On a parallel course, the Rangers' boat lined up to Mr. Wilde's boat so Dallemolle was in line with the window of Mr. Wilde, sitting while Mr. Wilde piloted his boat. Dallemolle gestured several times to Mr. Wilde, who made eye contact several times with Dallemolle, for Mr. Wilde to slow down or stop. Dallemolle yelled repeatedly at Mr. Wilde "Stop" and "Come down" and attempting alternative hand gestures to indicate he wanted Mr. Wilde to stop. This continued for approximately twenty to thirty seconds. Though the Rangers' boat was keeping pace with Mr. Wilde's boat, the Rangers' boat was behind Mr. Wilde's boat on a parallel course at approximately a 'five o'clock' position. While Dallemolle was still continuing the hand gestures and yelling, Mr. Wilde made eye contact with Dallemolle. The Rangers perceived that

Mr. Wilde's boat turned abruptly at a shallow angle forcing the Rangers' boat to veer away. However, Grodjesk maneuvered the Rangers' boat away from Mr. Wilde's boat because the Rangers' boat was somewhat behind Mr. Wilde's boat on that parallel course.[6] During this time the boats were traveling at approximately between twenty and thirty miles per hour. The Ranger brought their boat back to a parallel course with Mr. Wilde's boat, but further away from Mr. Wilde's boat than before. Dallemolle again lined up his boat across from Mr. Wilde, so that Mr. Wilde and Dallemolle could see each other. Dallemolle continued yelling at Mr. Wilde to stop and made hand gestures consistent with his request. The motors were very loud however Dallemolle again saw Mr. Wilde make eye contact with him several times. Dallemolle responded by pulling out his pistol and pointing it directly at Mr. Wilde through the window.[7] Mr. Wilde kept driving in the same path for another twenty to thirty seconds at the same speed. Dallemolle then went to the rear of his boat and obtained a shotgun and charged it. With the

---

[6] Dallemolle and Grodjesk testified it was their perception that Mr. Wilde's boat veered abruptly toward their boat. Mr. Schenk, Mrs. Wilde and Mr. Wilde all testified they had no recollection of an abrupt turn in the direction of the Ranger's boat and all testified that they at no time felt unsafe by Mr. Wilde's operation of his boat. Further discussion of this point is contained below under Count 3.

[7] Testimony at trial revealed that Dallemolle and Mr. Wilde were approximately 8-10 feet apart when Dallemolle pointed his pistol at Mr. Wilde.

shotgun in hand, Dallemolle went back to the bow of the boat and raised the shotgun and pointed it directly at Mr. Wilde. Mr. Wilde saw Dallemolle raising the shotgun and then turned his boat very sharply, toward the bank of the river. Mr. Wilde's boat slowed as it approached land and beached on the bank of the river. The Rangers' boat followed and initially turned wide, making a wide 'S' turn, until Mr. Wilde's boat was beached. The Rangers' boat crossed the wake of Mr. Wilde's boat, then moved towards the shore. As the Rangers' boat approached the shore, Dallemolle yelled loudly three times to the occupants of Mr. Wilde's boat directions "Leave your firearms in the boat. Keep your hands up. Exit the boat and sit down on the bank." The last time Dallemolle yelled his instructions, the Ranger boat was within 15 feet of Mr. Wilde's boat and Mr. Wilde was already on shore. The Rangers' boat landed between ten and twenty feet up river from Mr. Wilde's boat approximately ten seconds after Mr. Wilde's boat landed on the shore. Dallemolle left the Rangers' boat as soon as his boat touched land. Grodjesk shut off his motor within a second of landing and then came out of the helm, through the cabin to set their boat's anchor. At this time, Mr. Wilde was already on land, having exited his boat and initially put down the anchor. Mr. Shenk was in the bow of the boat. Mr. Wilde just began walking toward Dallemolle and the Rangers' boat. Mr. Wilde walked toward Dallemolle with his arms

about six inches out to each side and his fists clenched. Mr. Wilde started walking in the direction of the Rangers' boat when Dallemolle was about to land. Mr. Wilde was yelling at Dallemolle "Fucking cock suckers" and "What are you doing?". Grodjesk set the anchor for the Ranger's boat and then came around to the right side of Dallemolle. Grodjesk yelled "Stop, police, stop" or words to that effect several times. At the same time, Mr. Shenk exited Mr. Wilde's boat, went to the anchor and further secured the anchor to the shoreline.

As Mr. Wilde continued to close the distance between himself and Dallemolle, the Ranger took two steps backward in order to maintain a constant distance from Mr. Wilde. Dallemolle told Mr. Wilde to "Stop. Police. Stop right there." Grodjesk yelled to Mr. Wilde to "get on the ground." When Mr. Wilde refused to get on the ground and kept walking toward the Rangers, Grodjesk tried to restrain Mr. Wilde by grabbing Mr. Wilde by the arm and taking him to the ground. Mr. Schenk started to get up from his seat in the boat, and Dallemolle instructed him to remain where he was, an order which Mr. Schenk complied with immediately. Dallemolle laid his shotgun on the ground and began to assist Grodjesk. Grodjesk attempted to grab Mr. Wilde's wrists, but Mr. Wilde drew his arms into his chest. Grodjesk ordered Mr. Wilde to "stop resisting" several times. Dallemolle sat on Mr. Wilde's legs to prevent him from kicking

Grodjesk. Mr. Wilde still had his hands underneath his body and refused to allow himself to be handcuffed. Grodjesk drew his taser, and ordered Mr. Wilde to surrender his hands or be 'tased'. Dallemolle stood up, pulled the front probe cartridge of his taser, and displayed it to Mr. Wilde. As soon as Mr. Wilde saw the taser, he stopped resisting and permitted himself to be handcuffed. Once Mr. Wilde was handcuffed, Mr. Wilde laid on his side breathing heavily continuing to swear and repeat 'you do not have the authority to do this' several times. Grodjesk conducted a search incident to arrest of Mr. Wilde's person and asked him medical questions to make sure Mr. Wilde was all right.

After Mr. Wilde had been arrested, Dallemolle wrote down the hull identification number from Mr. Wilde's vessel, and ran it through the Denali Dispatch Center for the National Park Service. The Dispatcher faxed Dallemolle a printout of the Alaska Public Information Network (ASPIN) records for the hull number. The fax report indicated that "no match" was found to the hull identification number on Mr. Wilde's boat. Grodjesk also conducted a search of Mr. Wilde and verified that he was not injured. Dallemolle took control of Mr. Wilde's vessel, driving it to Slaven's Cabin. Later, they transported Mr. Wilde's vessel, as well as the passengers, to Circle.

**DISCUSSION**

Count 1 (Interfering with Agency Function)

Mr. Wilde is charged with unlawfully interfering with a government agent who was engaged in an official duty in violation of 16 U.S.C. § 3 and 36 C.F.R. § 2.32(a)(1).

Title 16 U.S.C. § 3 provides the Secretary of the Interior with the authority to make regulations that govern lands under the jurisdiction of the National Parks Service (NPS) – regulations like 36 C.F.R. §2.32(a)(1) *See, e.g.* Clark v. Community for Creative Non-Violence, 468 U.S. 288 (1984); United States v. Nachtigal, 507 U.S. 1 (1993). In turn, 36 C.F.R. § 2.32(a)(1) prohibits "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty." Although it is not explicitly provided in the statute, the Ninth Circuit has recently held that the *mens rea* required under subsection § 2.32(a)(1) is "willfulness". United States v. Bibbins, 637 F.3d 1087 (9thCir. 2011).[8]

---

[8] Just five years ago, the Ninth Circuit reached a different conclusion. *See* U.S. v. Lin, 191 Fed.Appx. 526 (9th Cir. 2006) (unpublished). I find compelling the Court's reference to Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusions.") and Carter v. United States, 530 U.S. 255, 269 (2000) ("[t]he presumption

Mr. Wilde is charged with interfering with the Rangers' attempts to carry out their official duty of investigating whether Mr. Wilde was in compliance with boating safety regulations. Mr. Wilde proffered an explanation for his actions. During cross-examination, Mr. Wilde indicated that he refused to obey the Rangers' order to stop because he desired to protect his dog. When asked if there were other reasons, he indicated that he had "no answer for that." The testimony of Mr. Wilde is inconsistent with his own actions and other testimony he gave during the trial. Although there are significant disputes between the Rangers' testimony and that of Mr. Wilde and his witnesses, it is clear that Mr. Wilde was angry with the Rangers, and when the Rangers attempted to investigate, Mr. Wilde approached the Rangers and refused their orders to stop.

There is little question that the Rangers were engaged in an official duty while investigating Mr. Wilde. The facts tend to show that Mr. Wilde interfered with the Rangers' attempt to do that duty.

To understand this charge, it is important to consider Mr. Wilde's actions in the context of his contact with the Rangers.

---

in favor of *scienter* requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct."). However, I am bound by the decision in <u>Bibbins</u>, and apply it faithfully here.

The evidence presented at trial revealed that Mr. Wilde was upset with the Rangers and questioned their authority on the Yukon River. In this context, it appears likely that Mr. Wilde beached his boat with the intention to incite a conflict with the Rangers. Mr. Wilde approached the Rangers, and when ordered to stop, Mr. Wilde refused that order.

Accordingly, the final question remains: was Mr. Wilde's interference willful? The court has defined "willful," for purposes of 36 C.F.R. § 2.32(a)(1), as synonymous with "purposeful" and "intentional." <u>Bibbins</u>, 637 F.3d at 1091 fn. 3. In the instant case, Mr. Wilde refused to heed the Rangers' orders to stop, causing them to subdue him, he was acting willfully and with sufficient intent to support a conviction.

Mr. Wilde argues that the United States did not sufficiently allege a *mens rea* in the charging document. The Ninth Circuit has recently clarified that 36 C.F.R. § 2.32(a)(1) requires an intent of "willfulness". <u>Bibbins</u>, 637 F.3d at 1091. Mr. Wilde alleges that the failure of the United State to include the "willful" intent requirement should cause the charging document be dismissed for failure to state an offense. *See* Federal Rules of Criminal Procedure 12(b)(3)(B). However, the language of the information is almost identical to the

regulation for which Mr. Wilde is charged with violating.[9]  The United States Supreme Court has found that such a charging document is sufficient if it sets forth "the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'"  <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974) (internal citations omitted).  Here, the language of the charging document was almost identical to the regulation, and was sufficient to inform Mr. Wilde of the charge against him.  Therefore, the information properly pled all necessary elements of the offense.

Based on the evidence presented at trial, the United States has proven beyond a reasonable doubt that the Rangers were engaged in an official duty at the time of their interaction with Mr. Wilde and that Mr. Wilde willfully interfered with their attempt to perform their official duties.

---

[9]  Title 36 C.F.R. §2.32(a)(1) states: "(a) The following are prohibited:  (1)  Interference.  Threatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty."  The charging document stated that "JAMES ALBERT WILDE did unlawfully threaten, resist, intimidate and intentionally interfere with a government agent, to wit, a Park Ranger, who was then and there engaged in an official duty."

<u>Count 2 (Violating a Lawful Order)</u>

Count 2 alleges that Mr. Wilde violated a lawful order given by a Park Ranger when he fled after ordered to halt, all in violation of 16 U.S.C. §3 and 36 C.F.R. § 2.32(a)(2). Title 36 C.F.R. § 2.32(a)(2) prohibits "violating the lawful order of a government employee or agent authorized to maintain order and control public access." The subsection provides a list of activities during which it is unlawful to violate an order, including "law enforcement actions, and emergency operations that involve a threat to public safety or park resources, or other activities where the control of public movement and activities is necessary to maintain order and public safety." 36 C.F.R. § 2.32(a)(2). In this case, Mr. Wilde was charged with violating a lawful order given during a law enforcement investigation.

There is no serious dispute that the Rangers' order was lawful. Mr. Wilde contends that it was both unsafe and ill-advised; yet, he makes no showing that it was "unlawful." Furthermore, enforcing regulations that contribute to safety are actions which are covered under the regulation. *See, e.g.* <u>United States v. Bohn</u>, 622 F.3d 1129, 1137 (9th Cir. 2010) (enforcing helmet regulations). In the instant case, the

Rangers were enforcing boating safety regulations in requesting that Mr. Wilde submit to a safety inspection.

However, there is some question as to whether Mr. Wilde heard the Rangers' instructions. The Ninth Circuit decided a case interpreting § 2.32 (a)(2) with very similar facts in United States v. Poocha, 259 F.3d 1077, 1083 (9th Cir. 2001). In Poocha, the defendant was arrested for violating the lawful order of a Park Ranger. Mr. Poocha directed obscenities towards the Ranger, and refused to comply with the Ranger's orders. The Ninth Circuit noted that "Poocha's response to Ranger Lober, though protected by the First Amendment, indicates that he heard and understood Lober's order… and willfully disobeyed it." 259 F.3d at 1083. In this case, Mr. Wilde's responses similarly show that he heard the orders. The profanity Mr. Wilde used towards the Rangers indicates that Mr. Wilde heard the Ranger's order, understood the order, and then refused to obey the order. Additionally, Mr. Wilde testified that he told the Rangers "no way, not out here" when asked to turn off his engine for an inspection. Mr. Wilde's responses indicate that he was fully capable of conducting a conversation with the Rangers, thereby negating the argument that Mr. Wilde did not hear the Rangers.

Mr. Wilde argues that the charging document specifically mentions "law enforcement actions", one of several instances when subsection (a)(2) may be enforced. Mr. Wilde argues that

16

the fact that he was not suspected of any wrongdoing when he first encountered the Rangers means that he cannot be convicted as the charging document describes. I disagree for two reasons. First, safety inspections are designed to verify compliance with boating regulations, including taking necessary corrective actions. Enforcing documentation laws is clearly a law enforcement function that serves the public interest. *See, e.g.* United States. v. Villamonte-Marquez, 462 U.S. 579 (1983). Second, the charging document need not contain the exact legal theory under which the defendant is charged. Mr. Wilde was aware of his actions, and knew the accusations against him. *See* Calderon v. Prunty, 59 F.3d 1005, 1009 (9th Cir. 1995) ("We have also recognized that a defendant can be adequately notified of the nature and cause of the accusation against him by means other than the charging document.")

During his closing arguments, Defense contended that Mr. Wilde's intention was to steer his boat towards a safe place for an inspection consistent with Alaska law governing the operation of vehicles and watercraft. However, there is no evidence, beyond his own testimony to show that this was Mr. Wilde's intention. First, Mr. Wilde's statements to the Rangers, including the fact that he never told the Rangers of his intention to submit to an inspection, show his refusal to comply with the Rangers' orders. Second, the court considered Mr.

Wilde's sudden acceleration of his boat away from the Rangers as eliminating any doubt regarding the likelihood that Mr. Wilde intended to comply with the Rangers' instructions.

The defense offered evidence that Mr. Wilde was part of a group in his community designed to educate about the relationship between federal and state jurisdiction in Alaska, and that Mr. Wilde had formed an opinion about federal jurisdiction over navigable waters based on his participation in that group. Mr. Wilde did not contend he did not know the law, but that he disagreed with whether it was appropriate. This testimony was not helpful to the defense, because it supported an inference that if Mr. Wilde believed that the Rangers should have lacked the authority to inspect his vessel, Mr. Wilde planned to refuse to submit to the inspection to make a point. However, in this case with these charges and the evidence presented here, the court disregards this evidence as irrelevant.

Mr. Wilde alleges that he should be found not guilty based on the defense of necessity. Mr. Wilde contends that had he followed the Rangers' orders, he would have been exposed to unacceptable danger. In order to prevail on a necessity defense, Mr. Wilde must show (1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal

relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law. United States v. Arellano-Rivera, 244 F.3d 1119, 1125-26 (9th Cir. 2001).  These elements are stated in the conjunctive, and all must be shown in order to sustain the defense.  Id.

Mr. Wilde's assertion of the necessity defense fails because he cannot show that the harm was "imminent" and because there were other legal alternatives to violating the law.  Mr. Wilde alleges that the existence of hazards in the Yukon River such as hidden sandbars, gravel bars, deadheads, and sweepers are "ever present and always imminent."  Historically, courts have been reluctant to find all but the most serious emergencies as presenting imminent danger.  See United States v. Bibbins, 637 F.3d at 1093-1094 (broken leg pain not sufficient danger to justify ignoring Park Ranger's orders); United States v. Cervantes-Flores, 421 F.3d 825, 829 (9th Cir. 2005) (HIV diagnosis not sufficient to justify illegal border crossing); United States v. Xian Long Yao, 302 Fed.Appx. 586, 587-588 (9th Cir. 2008) (fear of persecution by Chinese government not sufficient to justify illegal entry into Guam); There are few cases in the Ninth Circuit where the necessity defense failed specifically due to a lack of immediacy.  See, e.g. U.S. v. Perdomo-Espana, 522 F.3d 983, 987 (9th Cir. 2008) (risk created by high blood sugar caused by diabetes not imminent).  However,

the record shows that the dangers facing Mr. Wilde were not imminent. Mr. Wilde testified that his boat "might not start again." Mr. Compeau, the expert witness for Mr. Wilde, testified that shutting off the engine of Mr. Wilde's boat would "increase the risk" of harm. Mr. Compeau testified that "you *could* have a starter could hang up, the engine *could* not start, you *could* have a fuel boil situation in a carburetor, you *could* have a number of things go wrong." (emphasis added). Mr. Wilde's own testimony, as well as the testimony of his expert, concluded that it was not safe to turn off the engine of Mr. Wilde's boat because of the possibility that the engine could fail to restart, allowing his boat to be subject to the mercy of a swift moving river and all its attendant dangers. Yet the testimony of Mr. Wilde and Mr. Compeau fall short of proving that the risk was imminent.

Imminent means "likely to happen without delay". *Legislating the Necessity Defense in Criminal Law*, 52 Denv. L.J. 839, 845 (1975). Perhaps Mr. Wilde's boat would restart without incident; perhaps it would drift down the river without encountering any of the dangers that concerned Mr. Wilde. Mr. Wilde's testimony, when asked why shutting off his engine is a dangerous thing to do, replied "[i]t might not start again." Mr. Compeau, the expert witness for the defense, states almost all of his testimony in the conditional, including a consistent

use of the word "could" to describe the possibility that Mr. Wilde may have faced danger. However, neither Mr. Wilde nor Mr. Compeau testified to any concrete, specific or imminent danger had Mr. Wilde complied with the Ranger's order. The Court acknowledges Mr. Wilde's experience on the river, and recognizes that, in his opinion (and the opinion of his expert witness), it was unwise to comply with the order. However, the potential dangers faced by Mr. Wilde do not rise to the level of an imminent risk as required by the necessity defense.

Mr. Wilde's necessity defense also fails because he clearly had legal alternatives to his course of action. Although the parties disagree on whether Mr. Wilde drove his boat away with the intent to submit to an inspection in a safer area or whether he sped off in an act of defiance, the facts show that Mr. Wilde heard the Ranger's instructions to turn off his boat, he did not turn off his boat, and drove the boat away without telling the Rangers where he was going. Mr. Wilde did not attempt to avail himself of any other alternatives. The United States points out that Mr. Wilde could have attempted to vocalize his concern to the Rangers. Instead, he chose to ignore the order and foreclose the possibility of taking alternative action. Therefore, Mr. Wilde cannot avail himself of the necessity defense. Based on the evidence presented at trial, the United States has proven beyond a reasonable doubt that Mr. Wilde

violated a lawful order given to him by the Rangers while they were engaged in a law enforcement action.

Count 3 (Disorderly Conduct)

Count 3 charges Mr. Wilde with disorderly conduct in violation of 16 U.S.C. § 3 and 36 C.F.R. § 2.34(a)(1). That regulation prohibits knowingly and recklessly creating a risk of public nuisance and violence within areas under the jurisdiction of the National Park Service. In support of this charge, the United States alleges that Mr. Wilde engaged in disorderly conduct when he swerved his boat within three feet of the Ranger's vessel, forcing them to take evasive action to avoid a collision.

One of the threshold questions concerns who was the victim of the alleged disorderly conduct. The testimony and argument presented by the United States suggests that Mr. Wilde's actions, as testified to by the Rangers, put the Rangers in danger. However, risk to National Park Rangers alone is not sufficient to support a conviction. In United States v. Taylor, the Ninth Circuit held that a defendant could not be convicted under § 2.34(a)(2), which relies on the same operative language as (a)(1), because the "public" was never threatened. ("[T]he disorderly conduct statute requires a public component to the proscribed behavior.") 258 F.3d 1065, 1068 (9th Cir. 2001).

The defendant in Taylor was intoxicated, and when confronted by a National Park Service ranger, responded in a threatening fashion. The court held that because there were no members of the public in the cabin where the defendant was sleeping, the "public" element was not satisfied.

At trial in the instant case, the United States introduced evidence from the Rangers that they felt concerned for their safety when Mr. Wilde caused his boat to swerve. In contrast, both Mr. Schenk and Mrs. Wilde testified that they never felt concerned for their safety as a result of Mr. Wilde's operation of the boat. An important inquiry is whether Mr. Wilde's actions, if they created only a threat of harm to the Rangers, were sufficient to support a conviction. The court in Taylor noted an important distinction: "the word "public" was intended to modify not only alarm, but also nuisance, jeopardy, and violence. Congress has already prohibited private nuisance (harassment), private jeopardy (assault), and private violence (battery)." 258 F.3d at 1068. Thus, the court appears to suggest that, if the potential harm were to befall the Rangers, rather than the "public", the correct charge would be either assault or battery.

Another important fact which supported the result in Taylor was the lack of a "public" in the surrounding vicinity. Taylor, 258 F.3d at 1066. ("The incident occurred totally within

Taylor's cabin. The officer and Taylor were the only people in the cabin. Although two other officers were outside, no other civilian was within 100 feet of the cabin.")   At trial, there was no evidence introduced by the United States to show that there were any other members of the "public" in the vicinity of the two boats.   The United States argued that it was the Rangers, and not the passengers in Mr. Wilde's boat, that constituted the party at risk of harm.   However, even if we go beyond the United States' argument to consider Mrs. Wilde and Mr. Schenk members of the public who were "at risk", both of those individuals testified that they do not remember any action by Mr. Wilde to "swerve" at the Rangers' vessel, and both testified that they did not feel in danger at any time based on Mr. Wilde's operation of the boat.

This court concludes, there is a lack of evidence, beyond the testimony of the Rangers, to prove that Mr. Wilde is guilty of disorderly conduct.   Unlike Count 1, where Mr. Wilde admitted that he refused the Rangers' orders to stop, forcing the Rangers to subdue him, Count 2 where Mr. Wilde's words and actions showed that he did not follow the Ranger's instructions, and Count 4, where Mr. Wilde concedes that he did not have the registration decals properly displayed, here a reasonable doubt exists as to whether Mr. Wilde's actions constituted disorderly conduct.

The United States failed to prove beyond a reasonable doubt that Mr. Wilde attempted to strike the Rangers' boat, thereby placing members of the public at risk for nuisance and violence, requiring a finding of not guilty on Count 3.

Count 4 (Operating an Unregistered Boat)

Count 4 charges Mr. Wilde with operating an unregistered boat in violation of 16 U.S.C. §3, and 36 C.F.R. §3.2(b), AS 05.25.055(a) & (d), and AS 05.25.090(b)(2). During the pre-trial phase of this case, Mr. Wilde challenged the jurisdiction of the court to adjudicate this count on the basis that the U.S. Government has not been granted the authority to enforce non-criminal state regulations. That challenge was denied, as described in footnote 1.

Title 36 C.F.R. §3.2(b) provides, in relevant part, that vessels and their operation on all waters subject to the jurisdiction of the National Park Service are governed by the laws and regulations of the State within whose interior boundaries the park is located. Alaska Statute 05.25.055(a) requires that boats placed in the waters of Alaska must be registered and numbered. Alaska Statute 05.25.055(d) requires that all boats on the waters of Alaska must have been awarded a valid certificate of number by the Department of Administration, and must properly display the identification number and any

required decals on the boat. Alaska Statute 05.25.090(b)(2) sets the fine for not properly displaying the identification number and required decals at $50, and classifies it as a "violation" pursuant to AS 11.81.900.

At trial, the government presented the testimony of Rangers Dallemolle and Grodjesk, who both testified that they did not observe any registration markings on the hull of Mr. Wilde's boat. Dallemolle also indicated that he initiated a record check on the hull identification number of the boat, and ran the number through the Alaska Public Safety Information Network (ASPIN) system. The APSIN report indicated that the hull identification number was not registered with the State of Alaska.

Mr. Wilde makes no attempt to dispute the facts that would support a guilty verdict on Count 4. Instead, Mr. Wilde continues to challenge the authority of the Government to prosecute him. Mr. Wilde asserts that the Assimilative Crimes Act, 18 U.S.C. §13, does not provide jurisdiction to the Government to prosecute non-criminal offenses. Mr. Wilde also argues that Count 4 fails to state a crime, because Alaska Statute defines the offense alleged in Court 4 to be a violation, which is a non-criminal offense.

Mr. Wilde's first contention, that the Assimilative Crimes Act (ACA) does not apply to non-criminal offenses, fails to

recognize that Mr. Wilde is not charged with violating a state statute assimilated under the ACA. Rather, Mr. Wilde is charged with violating the statute pursuant to 36 C.F.R. §3.2(b). If Mr. Wilde was charged under the ACA, he would be correct. *See* United States v. Carlson, 900 F.2d 1346 (9th Cir. 1990). However, Carlson also makes clear that there are alternative methods to prosecute individuals for non-criminal acts committed on federal lands. *Id.* at 1349 ("[O]ur conclusion that speeding violations… are not assimilated will not necessarily have a disruptive effect on the enforcement of speeding laws in federal enclaves in Hawaii. In the future, violators may simply be charged pursuant to [Title 34 of the Code of Federal Regulations] section 634.4(c)(4) rather than under the Act."). In the instant case, Mr. Wilde was charged under one of those alternative methods. Thus, his claim that the ACA does not provide jurisdiction for non-criminal acts is without merit.

Mr. Wilde's second contention is that Count 4 should be dismissed because it fails to state a crime. Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure allows a defendant to raise a motion that the information fails to state an offense at any time while the case is pending. In making a determination as to whether the government has failed to state an offense, the district court is bound by the four corners of the information. *See* United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002).

The indictment alleges that Mr. Wilde "did unlawfully operate on the Yukon River an unregistered boat to which a certificate of number had not been awarded by the State and on which a validation decal was not displayed." In ruling on a motion to dismiss for failure to state an offense, the court must accept all of the allegations in the information as true. <u>Boren</u>, 278 F.3d at 914.

Here, Mr. Wilde does not allege a defect in the drafting of the complaint; rather, he alleges that the complaint charges him with a non-criminal offense. The state statute under which Mr. Wilde is charged, AS 05.25.055, is listed as a "violation." AS 05.25.090(b)(2). Alaska defines a violation as "a noncriminal *offense* punishable only by a fine, but not by imprisonment or other penalty." AS 11.81.900(63) (emphasis mine). The same section defines "offense" as "conduct for which a sentence of imprisonment or fine is authorized; an offense is either a crime or a violation." AS 11.81.900(39). Thus, it is clear that the violation that Mr. Wilde is charged with is an "offense," which was properly charged by the United States. Therefore, the court denies Mr. Wilde's claim that the prosecution failed to state an "offense."

Additional Arguments Made by the Defense

Mr. Wilde suggests that the Court might employ a "Thorne Instruction" to presume that, had the tracking log in the Rangers' GPS unit been enabled, the evidence would have been favorable to the defense. *See* Thorne v. Department of Public Safety, 774 P.2d 1326 (Alaska 1989). However, unlike this case, in Thorne the evidence that was in dispute was a videotape which the arresting officer had made, and then later erased. The Alaska Supreme Court held that "the state must preserve and make available to a criminal defendant material evidence gathered in a criminal investigation which may prove important in the preparation of the accused's defense." Thorne, 774 P.2d at 1330. However, in the instant case there was no "evidence" to preserve. Rather, Mr. Wilde alleges that it was the failure of the Rangers to create the evidence that should give rise to the Thorne instruction. Mr. Wilde has not cited any cases that suggest that the Rangers were under any obligation to create evidence, nor that they destroyed evidence in existence. Thus, the Thorne instruction is inapplicable.

Mr. Wilde also suggests that the United States' failure to electronically record his statements is a violation of his rights under Stephan v. State, 711 P.2d 1156, 1159 (Alaska 1985). In Stephan, the Alaska Supreme Court held that the Due

Process of the Alaska State Constitution requires "recording [as] a requirement of state due process when the interrogation occurs in a place of detention and recording is feasible." *Id.* Mr. Wilde's reliance on Stephan is misplaced. First, the Alaska Supreme Court made clear that their ruling is based solely on the Alaska Constitution, not the United States Constitution. *Id.* at 1160 ("It must be emphasized that *our holding is based entirely upon the requirements of article I, section 7, of the Alaska Constitution*, as interpreted by this court.") (emphasis original). Second, the court held that the rule only applies "to custodial interrogations conducted in a place of detention, such as a police station or jail, where it is reasonable to assume that recording equipment is available, or can be made available with little effort." *Id.* at 1165. (emphasis original). Thus, because the state Supreme Court's ruling relied on the Alaska constitution, and because the decision applies only to interrogations conducted in the place of detention, Mr. Wilde's rights were not violated pursuant to Stephan.

## CONCLUSION

For the foregoing reasons, the court finds Mr. James Albert Wilde guilty of Interference with an Agency Function as charged in Count 1, Violating a Lawful Order as charged in Count 2, and Operating an Unregistered Boat as charged in Count 4. The court

further finds Mr. James Albert Wilde not guilty of Disorderly Conduct as charged in Count 3. Sentencing for Count 1, 2, and 4 shall be set by separate order.

DATED this 11th day of October, 2011, at Fairbanks, Alaska.


/s/ Scott A. Oravec_____
SCOTT A. ORAVEC
United States Magistrate Judge