IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff/Appellee, | Case No. 4:10-cr-21 RRB |
| vs. | O R D E R |
| JAMES ALBERT WILDE, | |
| Defendant/Appellant. | |

This matter arises from a four-count misdemeanor information filed on September 17, 2010.[1] The four count information charged James Albert Wilde with Interfering with an Agency Function in violation of 36 C.F.R. § 2.32(a)(1),[2] Violating a Lawful Order in violation of 36 C.F.R. § 2.32(a)(2),[3] Disorderly Conduct in violation of 36 C.F.R. § 2.34(a)(1), and Operating an Unregistered Boat, in violation of 36 C.F.R. § 3.2(b), AS 05.25.055(a) & (d) and AS 05.25.090(b)(2). These offenses were alleged to occur on or about September 16, 2010, within the Yukon-Charley Rivers National Preserve. Following a bench trial, the magistrate judge issued a written order concluding that the government had met its burden of proof as to Counts 1, 2, and 4, but not as to Count 3.[4] Wilde appeals.

---

[1] Docket 1.

[2] Title 36 C.F.R. § 2.32(a)(1) prohibits "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty."

[3] Title 36 C.F.R. § 2.32(a)(2) prohibits "violating the lawful order of a government employee or agent authorized to maintain order and control public access."

[4] Docket 85.

1

Appellant's Brief[5] is supported by the Brief of the State of Alaska as Amicus Curiae.[6] The United States has responded,[7] supported by the National Parks Conservation Association ("NPCA") as Amicus Curiae.[8] Appellant filed a Reply.[9] The United States filed a 28(j) letter to which Wilde has responded.[10] Oral argument was not requested. The Court, being fully apprised of the matter, now enters the following order.

## STANDARD OF REVIEW

The construction or interpretation of a statute is a question of law reviewed de novo. *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012). Interpretation of agency regulations is also reviewed de novo. *United States v. Bohn*, 622 F.3d 1129, 1135 (2010). The constitutionality of a statute is reviewed de novo, as is the constitutionality of a regulation challenged as exceeding congressional authority. *Bohn*, 622 F.3d at 1133.

>

>

>

>

>

---

[5] Docket 112.

[6] Docket 134.

[7] Docket 136.

[8] Docket 146.

[9] Docket 150.

[10] Docket nos. 151 & 153.

## BACKGROUND

The Court takes notice of the factual background as summarized by the magistrate, which the parties do not dispute.[11] Briefly, on September 16, 2010, Wilde, his wife, and a friend, Fredrick Schenk, took Wilde's twenty-one foot Woolridge riverboat on the Yukon River for a hunting trip. National Park Service ("NPS") Rangers Andrew Dallemolle and Benjamin Grodjesk worked on the Yukon River. Dallemolle and Grodjesk were checking boats to make sure they were in compliance with applicable regulations, including boating safety and hunting and fishing regulations. Upon encountering Wilde's vessel, when the boats were between two-and three-hundred yards apart, Dallemolle went on the bow of his vessel, put out the boat's bumpers, and signaled to Wilde's boat to come toward the Rangers' boat. Wilde did as instructed. Dallemolle yelled to Mr. Shenk (the only visible passenger): "tell the driver to come to an idle . . . National Park Service, we're going to do a vehicle inspection." Wilde then opened a front window hatch from the cabin on the bow of his boat and stepped partially onto the bow of his boat. Wilde's boat coasted under its own momentum, with its engine idling, towards the Rangers' vessel until it was approximately 20 feet away. Dallemolle stated: "National Park Service, we're going to do a quick vehicle inspection. Shut off your engine and we'll come to you." Mr. Wilde yelled back "like hell," stepped back into his cabin, slammed his door shut and immediately walked to the stern of his boat, where he was fully visible to Dallemolle. Wilde then yelled profanities at the Rangers, and said "I'm not stopping." Dallemolle responded "We'll have you on your way in a few minutes." Wilde responded with more profanity, powered up the vehicle, and began moving his boat forward. The Rangers put power to their engine to pursue Wilde's boat. Dallemolle

---

[11] Docket 85.

gestured several times to Mr. Wilde, who made eye contact several times with Dallemolle, for Wilde to slow down or stop. It was not until Dallemolle pointed a shotgun at Wilde that Wilde headed for the bank.

Once on land, and despite the instructions to "exit the boat and sit down on the bank," Wilde began walking toward the Rangers with clenched fists, yelling profanities. Grodjesk tried to restrain Wilde by grabbing him by the arm and taking him to the ground. Dallemolle laid his shotgun on the ground and began to assist Grodjesk. Grodjesk attempted to grab Wilde's wrists, but Wilde resisted. Dallemolle sat on Mr. Wilde's legs to prevent him from kicking Grodjesk. Wilde refused to allow himself to be handcuffed until Grodjesk drew his taser, at which time he stopped resisting and permitted himself to be handcuffed.

Based on the evidence presented at trial, the magistrate found that the United States had proven beyond a reasonable doubt that the Rangers were engaged in an official duty at the time of their interaction with Wilde, and that he willfully interfered with their attempts to perform their official duties. The magistrate also found that Wilde violated a lawful order given to him by the Rangers while they were engaged in a law enforcement action.[12] The magistrate further found that Wilde made no attempt to dispute the facts that supported a guilty verdict on Count 4, instead, challenging the authority of the Government to prosecute him. The magistrate concluded there was a lack of evidence, beyond the testimony of the Rangers, to prove that Wilde was guilty of disorderly conduct, as alleged in Count 3.

The magistrate judge noted that the United States has not denied that the State of Alaska owns the land underneath the river. However, he concluded that just because the State of Alaska

---

[12] Docket 85 at 21.

owns the riverbed, it does not follow that the State exclusively controls the water flowing over that river bed. The magistrate found that NPS has proprietary jurisdiction (the right to regulate) over the Yukon River where it runs through the Yukon-Charley Rivers National Preserve.[13] Accordingly, in exercising that jurisdiction, the magistrate concluded that the State of Alaska's ownership of the riverbed is of no import. The magistrate's decision relied significantly on *United States v. Bohn*.[14]

Wilde appeals from the January 6, 2012, final judgment of the magistrate judge.[15] The crux of Wilde's argument is that there is a conflict between an Act of Congress and the application of later promulgated federal regulations, resulting in actual conflicts between federal employees unlawfully asserting their presumed authority, and citizens who operate private vessels on the Yukon River where it passes through the Preserve.[16]

---

[13] Docket 52 at 5. "The federal government has at least proprietary jurisdiction over land that it owns." *U.S. v. Bohn*, 622 F.3d 1129, 1133 (9th Cir. 2010) (citing *Kleppe v. New Mexico*, 426 U.S. 529, 539, 542-43 (1976) "The Property Clause grants Congress plenary power to determine what are needful rules respecting the public lands. That power does not depend on the existence of concurrent or exclusive jurisdiction. . . . [T]he Supreme Court explained:

> [W]hile Congress can acquire exclusive or partial jurisdiction over lands within a State by the State's consent or cession, the presence or absence of such jurisdiction has nothing to do with Congress' powers under the Property Clause. Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause.

*Id.* at 1133-34 (internal citation and quotation omitted).

[14] 622 F.3d 1129. In *Bohn*, the Ninth Circuit considered a case where a motorcyclist on a federal road disobeyed a NPS ranger's orders to stop and to identify himself. *Id.* at 1132. The court held that pursuant to its powers under the Property Clause, the federal government may enforce regulations on land over which it has merely proprietary jurisdiction.

[15] Docket 112 at 9.

[16] Docket 112 at 10-11.

Wilde's position is that the NPS does not have jurisdiction on the Yukon River to stop vessels in order to conduct safety inspections.[17]

## DISCUSSION

The Yukon-Charley Rivers National Preserve ("the Preserve") is located in east central Alaska along the border with Canada. It encompasses one-hundred fifteen miles of the Yukon River and the entire Charley River basin. It became a federal reservation when President Carter proclaimed the area a National Monument on December 1, 1978. Congress then redesignated it a National Preserve on December 2, 1980, in the Alaska National Interest Lands Conservation Act [ANILCA].[18] ANILCA established conservation system units ("CSUs") of the National Park System, including the Yukon-Charley River National Preserve.[19] ANILCA also directed the Secretary of the Interior to administer the National Park System. Specifically, it provides the Secretary with the authority to make regulations that govern lands under the jurisdiction of the NPS.[20]

It is undisputed that the State of Alaska owns the submerged lands beneath the navigable waters of the Yukon River within the National Preserve, where the incident at issue took place.

---

[17] *Id.*

[18] 16 U.S.C. § 3101 et seq.

[19] 16 U.S.C. § 410hh(10) (1996).

[20] "The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service . . ." 16 U.S.C. § 3. In 1976, the Secretary of the Interior, as head of the National Park Service, was given the authority to promulgate and enforce regulations regarding boating and other activities relating to waters located within areas of the National Park System. 16 U.S.C. § 1a-2(h).

Under the Submerged Lands Act,[21] states enjoy a presumption of title to submerged lands beneath inland navigable waters within their boundaries. *Alaska v. U.S.*, 545 U.S. 75, 78-79 (2005).[22]

With the exception of circumstances not present here, vessels and their operation on all waters **subject to the jurisdiction of the NPS** are governed by the laws and regulations of the state within whose interior boundaries the park is located.[23] Furthermore, "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty" is prohibited, and "the regulations contained in this section apply, regardless of land ownership, on all lands and waters within a park area that are under the legislative jurisdiction of the United States."[24] The NPS asserts this statutory authority to administer the Preserve and, accordingly, to enforce Alaska law on the waterways.

---

[21] 43 U.S.C. § 1301 *et seq*.

[22] The Submerged Lands Act also provides the States and the United States with "concurrent jurisdiction over the waters above the submerged lands" for purposes of commerce, navigation, national defense, and international affairs. *Barber v. State of Hawaii*, 42 F.3d 1185, 1190 (9th Cir. 1994); *Pacific Merchant Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1168 (9th Cir. 2011); 43 U.S.C. §§ 1311(d), 1314. However, *Babbitt* held that "neither the language nor the legislative history of ANILCA suggests that Congress intended to exercise its Commerce Clause powers over submerged lands and navigable Alaska waters." 72 F.3d at 703.

[23] 36 C.F.R. § 3.2(b) (2007) (emphasis added). Boats placed in the waters of Alaska must be registered and numbered. AS 05.25.055(a). All boats on the waters of Alaska must have been awarded a valid certificate number by the Department of Administration, and must properly display the identification number and any required decals on the boat. AS 05.25.055(d). The fine for not properly displaying the identification number and required decals is $50. AS 05.25.090(b)(2) .

[24] 36 C.F.R. § 2.32(b) (1987).

The issue, therefore, is whether the Yukon River is subject to the jurisdiction of the NPS. Wilde and the State argue that NPS has promulgated regulations under ANILCA that overreach. Wilde complains that "the NPS [has changed its] interpretation of sections of ANILCA as it pertains to the Yukon River, a portion of which runs through the Preserve."[25] Wilde and the State argue that in 1996, the Park Service "abruptly changed its interpretation of its statutory authority and adopted the national regulation extending federal jurisdiction to regulate public activities in state waterways within national park unit boundaries," thus overreaching the plain language of § 103.[26]

Section 103(c) of ANILCA reads:

> Only those lands within the boundaries of any conservation system unit which are **public lands** (as such term is defined in this Act) shall be deemed to be included as a portion of such unit. No lands which, before, on, or after December 2, 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable **solely to public lands** within such units. If the State, a Native Corporation, or other owner desires to convey any such lands, the Secretary may acquire such lands in accordance with applicable law (including this Act), and any such lands shall become part of the unit, and be administered accordingly.[27]

The term "public lands" is defined as:

> [L]and situated in Alaska which, after December 2, 1980, are Federal lands, except--
>
> land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law . . . [28]

---

[25] Docket 112 at 16.

[26] Docket 134 at 11.

[27] 16 U.S.C. § 3103(c) (1980) (emphasis added).

[28] 16 U.S.C.A. § 3102(3)(A) (1998).

The United States and the NPCA argue that this issue was settled in *State of Alaska v. Babbitt*.[29] *Babbitt* involved the ANILCA- created Wrangell-St. Elias National Park, and the Ninth Circuit addressed "the meaning of the definition of public lands in §102 of ANILCA."[30] The parties disputed whether navigable waters were public lands.[31] The court clarified that "public lands are lands, waters, and interests therein, the title to which is in the United States."[32] In its analysis, the court rejected the argument that *all* navigable waters are public lands within the meaning of ANILCA, concluding that only *some* navigable waters qualified as public lands.[33] In determining *which* navigable waters were public lands, the court noted that the appurtenant navigable waters located in the vast parcels of land reserved for federal purposes in Alaska through a myriad of statutes are included in the definition of public lands by virtue of the reserved water rights doctrine. In a footnote, the court expressly stated "these statutes include, but are not limited to, acts reserving land for national parks, forests and wildlife preserves . . . and ANILCA itself."[34] The court in *Babbitt* held:

---

[29] 72 F.3d 698 (9th Cir. 1995).

[30] Section 102 is the "definitions" section of ANILCA.

[31] 54 F.3d at 702.

[32] *Id.*

[33] *Id.*

[34] *Babbitt*, 72 F.3d at 703, n. 10. The Court recognized that this holding imposed "an extraordinary administrative burden on federal agencies," and suggested that the issue "cries out for a legislative, not a judicial, solution." *Id.* at 704. An en banc Ninth Circuit panel affirmed *Babbitt* in a per curiam opinion. *Katie John v. United States*, 247 F.3d 1032 (9th Cir. 2001) (en banc). However, some of the judges concurred in the conclusion, but wrote separately to express their belief that the Commerce Clause, rather than the reserved water rights doctrine, was the source of Congress's authority.

> By virtue of its reserved water rights, the United States has interests in some navigable waters. Consequently, public lands subject to subsistence management under ANILCA include certain navigable waters. For these reasons, we hold to be reasonable the federal agencies' conclusion that the definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine. We also hold that the federal agencies that administer the subsistence priority are responsible for identifying those waters.[35]

The United States argues that *Babbitt* clearly indicates that the Yukon River within the Preserve must be determined a "public land" in this case. Wilde suggests that *Babbitt* does not control because it was a subsistence case, and this case pertains to the NPS exercising jurisdiction by stopping vessels in order to conduct safety inspections.[36] Wilde argues that it was after the *Babbitt* holding that "the NPS gradually interpreted its own regulations regarding 'public lands' as being applicable also to non-subsistence administrative matters. Challenges to the NPS's jurisdiction have naturally arisen . . . [and] . . . it is apparent that a creeping federal overreach has subtly developed, culminating in the events giving rise to the instant appeal."[37]

The State of Alaska, in its amicus brief, agrees with Wilde that *Babbitt* was limited to subsistence issues and that the lack of ambiguity or conflicting terms in section 103(c) does not require the type of intricate analysis engaged in by the *Babbitt* court.[38] Rather, the State suggests that this Court need look no further than the plain language of section 103(c) to conclude that the Park Service lacks legal authority to apply its regulations to navigable waters without regard to the ownership of submerged lands, tidelands, or lowlands.[39]

---

[35] *Id.* at 703-04.

[36] Docket 112 at 10.

[37] Docket 112 at 22.

[38] Docket 134 at 27.

[39] Docket 134 at 29.

The Court concludes that if *Babbitt* applies, it is reasonable to conclude that the waters of the Yukon are navigable waters that the NPS could interpret as "public lands" under ANILCA. Although it is unclear from either *Babbitt* or *Katie John* whether these cases, and the definition of "public lands," were intended to apply exclusively to subsistence issues, the Court finds the following language from *Babbitt* particularly persuasive:

> Under the reserved water rights doctrine, when the United States withdraws its lands from the public domain and reserves them for a federal purpose, the United States implicitly reserves appurtenant waters then unappropriated to the extent needed to accomplish the purpose of the reservation . . . [and] courts must conclude that "without the water the purposes of the reservation would be entirely defeated."[40]

Here, the NPCA argues that "Congress created the Preserve to protect the Yukon and Charley Rivers and directed the Park Service to protect the values associated with those rivers. To do so, the Park Service must have the ability to regulate activities on navigable waters within the Preserve."[41] Specifically:

> The following areas are hereby established as units of the National Park System and shall be administered by the Secretary under the laws governing the administration of such lands and under the provisions of this Act: . . .
>
>> (10) Yukon-Charley Rivers National Preserve . . . shall be managed for the following purposes, among others: To maintain the environmental integrity of the entire Charley River basin, including streams, lakes and other natural features, in its undeveloped natural condition for public benefit and scientific study; to protect habitat for, and populations of, fish and wildlife, including but not limited to the peregrine falcons and other raptorial birds, caribou, moose, Dall sheep, grizzly bears, and wolves; and in a manner consistent with the foregoing, to protect and interpret historical sites and events associated with the gold rush on the Yukon River and the

---

[40] 72 F.3d at 703 (citations omitted).

[41] Docket 146 at 12.

> geological and paleontological history and cultural prehistory of the area . . . .[42]

The amicus brief argues that achieving this congressional directive would not be possible if the Park Service lacked authority to regulate activities on waters over state-owned submerged lands within the Preserve.[43] "Congress would not have directed the Park Service, on one hand, to preserve the Yukon and Charley Rivers in one portion of ANILCA and, on the other, strip the Park Service of all ability to regulate activities on waters overlying state-owned submerged lands."[44] In light of the foregoing, the Court is persuaded that *Babbitt* carries the day.

However, even if *Babbitt* is not controlling, the Court finds that the plain language analysis yields the same result. The rules of statutory construction:

> require[] us to presume that [the] legislature says in a statute what it means and means in a statute what it says there. . . . Thus, statutory interpretation begins with the statutory text. . . . If the statutory language is unambiguous and the statutory scheme is coherent and consistent, judicial inquiry must cease. . . . Resorting to legislative history as an interpretive device is inappropriate if the statute is clear.
>
> [U]nless otherwise defined, words [of a statute] will be interpreted as taking their ordinary, contemporary, common meaning . . . [and] words in different sections of the same statute should be construed similarly.[45]

Considering the plain meaning of §103(c):

> Only those lands within the boundaries of any conservation system unit which are **public lands** (as such term is defined in this Act) shall be deemed to be included as a portion of such unit.

---

[42] 16 U.S.C.A. § 410hh(10) (1996).

[43] Docket 146 at 16.

[44] Docket 146 at 20.

[45] *Miranda v. Anchondo,* 684 F.3d 844, 849 (9th Cir. 2012) (internal quotations and citations omitted).

Only "public lands" are part of the CSU, and the submerged lands beneath the rivers within the CSU, which belong to Alaska under the Submerged Land Act, arguably are not "public lands" under a plain language analysis. The status of the water above those submerged lands is arguably less clear. But Wilde and the State misinterpret the next sentence:

> No lands which . . . are conveyed to the State . . . shall be subject to the regulations applicable **solely to public lands** within such units.

Wilde suggests that this language means that State land within the CSU is never subject to regulations promulgated regarding federal ("public") land in the CSU. This Court finds that the plain language suggests otherwise. The word "solely" has significant meaning. If § 103 stated: "No lands which are conveyed to the State shall be subject to the regulations applicable **to public lands** within such units," then Wilde's interpretation would be correct. The word "solely" implies that there may be regulations that apply *exclusively* (or "solely") to public lands, and there may be regulations that apply to *all* lands within the CSU, regardless of ownership.

> We must "interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."[46]

Wilde's interpretation does not give effect to the word "solely." This is not that "exceptional case" where acceptance of the plain meaning of a word would "thwart the obvious purpose of the statute."[47]

In a similar misstep, Wilde's reply brief suggests that 16 U.S.C. 1a-2(h) limits the NPS's enforcement of Coast Guard regulations[48] to waters located within the CSUs that belong to the

---

[46] *Shelby v. Bartlett*, 391 F.3d 1061, 1064 (9th Cir. 2004) (internal citations omitted).

[47] *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982).

[48] At 36 C.F.R. § 3.2(a), the NPS adopts Coast Guard regulations.

federal government.[49] In other words, although the Coast Guard may have authority to board any vessel, Wilde believes the NPS's authority to enforce Coast Guard rules is restricted to the NPS's "public lands." Again, the plain meaning of § 1a-2(h) does not support Wilde's interpretation:

> In order to facilitate the administration of the national park system, the Secretary of the Interior is authorized, under such terms and conditions as he may deem advisable, to carry out the following activities:
> . . .
>
> (h) Regulations; promulgation and enforcement
> Promulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States: *Provided*, That [sic] any regulations adopted pursuant to this subsection shall be complementary to, and not in derogation of, the authority of the United States Coast Guard to regulate the use of waters subject to the jurisdiction of the United States.[50]

The Court finds that the language "including waters subject to the jurisdiction of the United States" does not *limit* NPS jurisdiction to U.S. waters, but rather clarifies that NPS has jurisdiction over those waters in conjunction with, but not in derogation of, the U.S. Coast Guard. The language does not limit, but rather expressly permits, NPS enforcement of regulations concerning boating "on or relating to waters located within areas of the National Park System." Such waters necessarily include waters above state-owned submerged land.

## CONCLUSION

Although *Babbitt* and the "plain meaning analysis" follow different routes, they reach the same conclusion. If a navigable waterway runs through a national park, forest, or preserve, as is the case here, the Federal Government may enforce Alaska law on that waterway despite the fact that the land below the waterway is owned by the State of Alaska. Here, the laws and regulations

---

[49] Docket 150 at 18.

[50] 16 U.S.C. § 1a-2(h) (2000).

pursuant to which Defendant was arrested and charged were not ambiguous nor inconsistent with the Federal Government's right to regulate activity within a Federal preserve. Like it or not, under the law as it currently exists, the Federal Government may regulate activity on that portion of the Yukon River that runs through the Yukon-Charley Rivers National Preserve, despite the fact that the land under the waterway is owned by the State of Alaska. Any concerns regarding the practicability or propriety of this law would best be addressed by a legislative, not judicial, solution. In the mean time, the Court is left with no alternative but to apply the law as it currently exists.

Accordingly, this appeal is DENIED and this matter is DISMISSED WITH PREJUDICE.

**It is so Ordered.**

Dated at Anchorage, Alaska, this 2nd day of December, 2013.

/s/Ralph Beistline
Ralph R. Beistline
United States District Judge
